JOHN O. GREEN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Green v. Commissioner
Docket No. 1405-91
United States Tax Court
T.C. Memo 1993-152; 1993 Tax Ct. Memo LEXIS 154; 65 T.C.M. (CCH) 2347; April 7, 1993, Filed *154 Decision will be entered under Rule 155. John O. Green, pro se. For respondent: William R. Leighton and James G. Macdonald. HAMBLEN
HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Chief Judge: By statutory notice of deficiency dated October 31, 1990, respondent determined a deficiency in petitioner's Federal income tax and additions to tax as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)(1)
Sec. 6653(b)(2)
Sec. 6654
1983
$ 294,971
$ 147,486
[1]
$ 18,051
All section references are to the Internal Revenue Code in effect for the taxable year at issue. References to rule 6(e) are to rule 6(e) of the Federal Rules of Criminal Procedure. All other Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. After concessions,[1] the issues for decision are: (1) Whether petitioner's delivery of his 1983 tax return to an agent of the Internal Revenue Service *155 (IRS) is sufficient to constitute a filing for purposes of section 6501, and if so, whether the 3-year statute of limitations under section 6501 bars assessment of tax in this case; (2) whether petitioner, a member of the Potawatomi Citizens Band Tribe of Oklahoma, is exempt from paying Federal income tax due to his Indian status; (3) whether respondent utilized grand jury matter in violation of rule 6(e) for civil audit purposes, including the preparation of the statutory notice of deficiency involved herein; (4) whether petitioner underreported his taxable income in 1983 as determined by respondent; (5) whether petitioner's understatement of tax is attributable to fraud under section 6653(b)(1) and (2); and (6) whether petitioner is liable for the addition to income tax for failure to pay estimated tax under section 6654. *156 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts, the supplemental stipulation of facts, and the second stipulation of facts are incorporated herein by this reference. Petitioner resided in Austin, Texas, at the time he filed his petition in this case. He is an enrolled member of the Potawatomi Citizens Band Tribe of Oklahoma. His enrollment number is 3989. Petitioner has not been issued a certificate of competency by the Secretary of Interior. Petitioner earned his undergraduate degree in accounting. He is not a certified public accountant. In approximately 1972, petitioner was employed by the IRS as a revenue agent. He served as a revenue agent for 9 months prior to becoming a special agent with the IRS. Petitioner was employed as a special agent with the IRS in Oklahoma City, Oklahoma, for approximately 6 years. After leaving the IRS due to a physical disability, petitioner, who had earned a law degree while working as a special agent, began practicing law in Oklahoma City, Oklahoma. While practicing law, petitioner held himself out to the public as a tax lawyer, although he did not have any particular type *157 of certification in tax law from the Oklahoma Bar. Petitioner incorporated his law practice and was the sole shareholder and employee of John O. Hornung, P.C. (the P.C.). During 1983, three checks in the total amount of $ 2,409 were made payable to petitioner on the P.C.'s checking account. Petitioner's wife, Patti Janese Hornung Parker (Ms. Parker), drafted these checks payable to petitioner, signed the checks in her name, and then deposited the amounts in an Oklahoma account. The notation on the checks indicated "salary" from January through March, a time during which petitioner was not in Oklahoma. Petitioner did not receive the proceeds from any of the checks. Petitioner and his law partner, Jay McCown (Mr. McCown), were shareholders of Torque Master, Inc., along with other investors. Torque Master, Inc., was an Oklahoma corporation engaged in an oil drilling related operation. During 1983, three checks were made payable to petitioner from Torque Master, Inc., in the following amounts: $ 942.63, $ 3,664.07, and $ 11,889.25. The check in the amount of $ 11,889.25 was written on a Kemper Money Market Account. During January 1983, petitioner separated from his wife. The *158 couple divorced on October 9, 1984. In May 1983, petitioner executed a power of attorney to Ms. Parker. Ms. Parker prepared and filed her and petitioner's 1982 joint Federal income tax return. She also prepared and filed returns for petitioner's professional corporation, including a return for the 1983 taxable year. Ms. Parker requested an extension of time for filing petitioner's individual 1983 return. She did not actually file a 1983 Federal income tax return for petitioner. Ms. Parker filed a separate tax return in 1983. She did not include any amounts from the checks which she drew on the P.C.'s account as income. In 1985, at petitioner's request, Ms. Parker mailed the 1983 tax return which she had prepared and her workpapers to petitioner's attorney, William Kirksey (Mr. Kirksey), in Jackson, Mississippi, where petitioner was being held in Federal custody. IRS Agent Bill Gibson (Agent Gibson) checked petitioner out of the Jackson city jail on February 14, 1985, and brought him to Mr. Kirksey's office. At that point, Agent Gibson was presented with the 1983 return, which Ms. Parker had prepared for petitioner. Petitioner began preparing Robert and Linda Schaffer's *159 (Mr. and Mrs. Schaffer) Federal income tax returns in approximately 1978. From 1976 until his death in October 1982, Mr. Schaffer was involved in the smuggling of illegal narcotics into the United States. Mr. Schaffer, a pilot, started by flying small, single-engine aircraft across the U.S. border into Mexico and bringing back marijuana. Several years later, the Schaffers moved to Oklahoma and they started flying from Florida to South America. Mrs. Schaffer was also a pilot, and although she did not actually accompany her husband on flights, she assisted Mr. Schaffer in the drug smuggling endeavors. On October 18, 1982, Mr. Schaffer and his brother, Stanley Gene Schaffer, were flying a load of narcotics from South America to the United States to be dropped by parachute to an individual named Paul Gonzales. Both Mr. Schaffer and his brother were killed when the plane they were flying crashed somewhere in the State of Mississippi. Mrs. Schaffer and Mr. Stanley Schaffer's wife, Donna Strange (Ms. Strange), were in an apartment in Florida on October 18, 1982. Paul Gonzales' father (Mr. Gonzales) went to the Florida apartment on the date of the crash and told Mrs. Schaffer and Ms. *160 Strange that their husbands had been involved in a plane crash. Shortly after receiving news of the crash, Mrs. Schaffer contacted petitioner. Mrs. Schaffer then returned to Oklahoma City, Oklahoma. As of October 15, 1982, petitioner began representing Mrs. Schaffer with regard to the drug trafficking activities. After Mrs. Schaffer returned to Oklahoma, petitioner and two of the Schaffers' friends, John Price and Billy Howell, flew a helicopter to Mississippi to inspect the crash site. Petitioner initially went to the crash site with Mr. Gonzales. Mr. Gonzales showed petitioner the wreckage while the bodies were still in the plane. Shortly thereafter, petitioner returned to the crash site with Mr. Price and Mr. Howell, removed Mr. Schaffer's body from the cockpit of the plane, and buried it. Mrs. Schaffer and Ms. Strange received a total of $ 380,000 for the narcotics that were dropped during the flight in which their husbands were killed. Upon receiving the money, Mrs. Schaffer counted the money from the last flight and the money already in her home. Mrs. Schaffer then took the money and stored it at her home in a safe built into the floor of the basement. Mrs. Schaffer *161 also had an additional $ 200,000 in the safe which was money accumulated from prior drug flights. Mrs. Schaffer had other money during the latter part of 1982 which was stored at her father-in-law's home. Throughout the fall of 1982, Mrs. Schaffer was concerned about the $ 580,000 of drug money being stored in her home for three reasons: First, the airplane crash was being actively investigated; second, her deceased husband had previously been investigated by a grand jury; and third, she was concerned about a search warrant regarding her home. Petitioner was Mrs. Schaffer's attorney at this point, and Mrs. Schaffer sought petitioner's advice regarding what to do with the cash stored in her home. Petitioner advised Mrs. Schaffer to put the money in a safe-deposit box. On December 3, 1982, petitioner and Mrs. Schaffer opened a safe-deposit box at the Southwestern Bank & Trust Co. in Oklahoma City, Oklahoma (the Southwestern Bank safe-deposit box). The safe-deposit box was styled "John Hornung Attorney Trustee for Linda Schaffer." Both petitioner and Mrs. Schaffer were authorized to enter the safe-deposit box. Mrs. Schaffer placed approximately $ 540,000 in the safe-deposit box. *162 Prior to depositing the money, Mrs. Schaffer counted the money in an effort to account for the portion which belonged to Ms. Strange. Mrs. Schaffer and Ms. Strange were to split the proceeds from the last drug trafficking operation approximately 60 percent to Mrs. Schaffer and the remainder to Ms. Strange. Petitioner's own records indicated that on December 3, 1982, $ 500,000 was placed into the Southwestern Bank safe-deposit box. During the latter part of 1982, Mrs. Schaffer's father-in-law wanted Mrs. Schaffer to move the money that she kept at his home. Mrs. Schaffer sought petitioner's advice regarding where to store the money. Petitioner advised her that she could store the money in a safe-deposit box that was already being rented by petitioner's grandmother. Mrs. Schaffer moved the money from her father-in-law's house to a safe-deposit box in the name of petitioner's grandmother. Mrs. Schaffer's name was added to the safe-deposit box prior to putting the cash into the box. This money was not placed into the Southwestern Bank safe-deposit box because there was not enough room in the box to allow for all of the cash. Mrs. Schaffer did not give petitioner the right to *163 use the money that was placed in either of the safe-deposit boxes. Moreover, Mrs. Schaffer did not at any time loan or discuss loaning any of the money to petitioner. Neither petitioner nor Mrs. Schaffer entered the Southwestern Bank safe-deposit box in December 1982 other than when the safe-deposit box was opened on December 3, 1982. On January 5, 1983, Mrs. Schaffer appeared before a grand jury in Oklahoma City, Oklahoma, concerning Mr. Schaffer, the drug smuggling activities, and the investigation of the plane crash in Mississippi. Petitioner and his law partner, Mr. McCown, represented Mrs. Schaffer during her appearance before the grand jury. In early January 1983, petitioner informed Mrs. Schaffer that he felt the money in the Southwestern Bank safe-deposit box was not safe due to the continuing criminal investigation and that the money should be moved to another location. Petitioner and Mrs. Schaffer determined that the money should be moved to a safe-deposit box in Dallas, Texas. On January 11, 1983, petitioner, with Mrs. Schaffer's knowledge, removed the $ 540,000 from the Southwestern Bank safe-deposit box and gave Mrs. Schaffer $ 40,000 for living expenses. Mrs. *164 Schaffer only wanted $ 40,000 at that time for living expenses because she did not want the rest of the cash in her house. On January 12, 1983, petitioner opened a safe-deposit box at the Union National Bank in Chandler, Oklahoma. Petitioner placed most of the money removed from the safe-deposit box at Southwestern Bank into the safe-deposit box at the Union National Bank, but without Mrs. Schaffer's knowledge. In late January 1983, Mr. McCown informed Mrs. Schaffer that petitioner was missing. At this point, Mrs. Schaffer did not know where either petitioner or her money was located. This is when she first believed her money had been misappropriated. Prior to this, Mrs. Schaffer was not concerned about the whereabouts of her money. Within 1 or 2 weeks after petitioner disappeared, Mrs. Schaffer received a letter from petitioner and $ 6,000 cash to make payments on a helicopter. Mrs. Schaffer reported a theft loss of $ 263,000 on her 1982 Federal income tax return. Mrs. Schaffer claimed the loss based on an accountant's advice and based on her belief that since she received the income from drug trafficking during 1982 and the loss was related to that source of income, the *165 loss should be reported in 1982. Petitioner did not report any of the money which he removed from the Southwestern Bank safe-deposit box as income for the 1983 taxable year. During 1983, petitioner knew that income from embezzlement was taxable, that income from illegal sources was taxable, and that if a taxpayer stole money from someone, it was taxable income. Petitioner left Oklahoma City, Oklahoma, on January 27, 1983, and went to Texas. Petitioner testified that he left Oklahoma because he feared for his life. The Federal Government had offered petitioner defendant/witness protection. After arriving in Austin, petitioner wrote a personal note in his journal stating: "There is so much right you wonder why its wrong." Petitioner did not work and had no other sources of income from January 28, 1983, until he was arrested in Austin, Texas, in 1985. When petitioner left Oklahoma in January 1983 he had at least $ 100,000 in cash plus some amount of silver and gold from non-Schaffer sources. Shortly after arriving in Austin, petitioner purchased a house for $ 57,018.15 cash and invested $ 84,775.31 in cash on repairs to the house. During 1984 petitioner compiled a list of his *166 assets which included the following items and his determination of correlative values: $ 15,000, 1983 Datsun 280ZX; $ 10,000, 1983 Datsun pickup; $ 20,000, 1983 Chevrolet motor home; $ 2,000, 1982 Yamaha motorcycle; $ 100,800, gold; $ 25,000, silver; $ 3,000, Ultralight airplane; and $ 6,100, loan to Mr. T.J. Palmer. The Datson 280ZX was purchased in a nominee name, Ken Copeland, to conceal ownership. Petitioner also had $ 122,000 in cash at the time the list was prepared. After arriving in Austin, Texas, petitioner decided to change his identity and made various notes to himself regarding the steps which needed to be accomplished to change his name. In March 1983, petitioner legally changed his name from John O. Hornung to John O. Green in a county court in Travis County, Texas. Petitioner was indicted by the grand jury of the Western District of Oklahoma on November 6, 1985, for two counts of willfully and knowingly aiding and assisting in the preparation of a false income tax return, in violation of section 7206(2), one count of conspiring to defraud the United States by concealing taxable income, in violation of 18 U.S.C. section 371, and *167 one count of perjury before a Federal grand jury, in violation of 18 U.S.C. section 1623. Petitioner was also indicted by a grand jury in the Southern District of Mississippi on December 17, 1985. He was convicted in May 1986 of conspiracy to defraud the United States by impeding the IRS in the determination of the Schaffers' income tax liabilities, but was acquitted of all other charges. Mrs. Schaffer and petitioner both testified at petitioner's criminal trial. Petitioner was sentenced to 5 years in prison. While in prison, petitioner was indicted on another felony count, to which he pled guilty. Grand Jury Materials
A grand jury began investigating the Schaffers and their drug trafficking activities during 1981. Petitioner was implicated during 1982. Special Agent Kemp was assigned to assist the grand jury in Oklahoma, and he collected information obtained through a grand jury subpoena on behalf of the grand jury. In February 1983 he testified before the grand jury concerning petitioner. While assisting the grand jury investigation in the Western District of Oklahoma, Special Agent Kemp, pursuant to a valid search warrant, searched *168 petitioner's residence in Austin, Texas, and seized various documents. The search warrant was issued by the U.S. District Court for the Western District of Texas on February 14, 1985, and authorized the search of petitioner's residence at 5708 Beacon Drive, Austin, Texas. The materials procured through the search were stored in Jackson, Mississippi. The following evidence was seized during the execution of the search warrant and was later introduced into evidence at petitioner's criminal trial: three pages from a black, three-ringed notebook which include a list prepared by petitioner in 1984 of the fair market value of all the assets is his possession; and a daily calendar for 1982 with an entry reflecting that $ 500,000 was moved into the Southwestern Bank safe-deposit box on December 3, 1982. The following evidence was also seized pursuant to the above-mentioned search warrant: two handwritten records maintained by petitioner, one labeled "Inventory-Safe Deposit"; and ten pages taken from a brown, mini-spiral notebook which included change of identity information and his master plan. The evidence attained through the search warrant was presented to the grand jury. In the *169 stipulation of facts, petitioner reserved objections to the following exhibits on the basis that such exhibits constituted grand jury material which were improperly used without a rule 6(e) order: (1) Eight purchase agreements for Bank American World Money traveler's checks; (2) a receipt and an odometer mileage statement relating to the purchase of a Datsun 280ZX; and (3) copies of receipts for gold and silver purchases. There is no evidence in the record to establish that any of these exhibits were presented to the grand jury, or somehow constitute grand jury matters. Petitioner also reserved objection with respect to a copy of a handwritten note labeled "Last Will & Testament". [2]
IRS Revenue Agent Frank DeShazo (Agent DeShazo) conducted the civil examination which resulted in the *170 statutory notice of deficiency in this case. During his investigation, Agent DeShazo traveled to Oklahoma City, where Special Agent Kemp provided Agent DeShazo with five or six boxes of records which contained grand jury material. During his visit, Special Agent Kemp instructed Agent DeShazo that he could not use the grand jury material in developing his case and showed Agent DeShazo where the copying machine was located, and then Special Agent Kemp left the room. Special Agent Kemp did not tell Agent DeShazo how the grand jury information would be identified. Agent DeShazo spent approximately half a day going through each box of records and making copies of some of the documents. The grand jury material was identifiable because it was in folders that had plastic labels which stated "grand jury material". Agent DeShazo skimmed through all of the materials and prepared a list of all the documents which he examined. The list which he prepared contains grand jury exhibits, grand jury transcripts, and other documents. Although Agent DeShazo read materials which were grand jury materials, he did not intentionally use the information during the civil examination. Agent DeShazo also *171 had access to Federal Bureau of Investigation (FBI) records in Jackson, Mississippi, in performing the civil examination. The materials consisted of eight boxes of records seized from petitioner's residence during the execution of the search warrant mentioned above. Agent DeShazo was instructed that none of the material was grand jury information and was allowed to copy any information which he thought would be useful. Prior to the trial in this case, respondent provided petitioner with the following information: The list prepared by Agent DeShazo noting the existence of grand jury material; Agent DeShazo's workpapers; and some materials used by him during his examination, which included grand jury material. District counsel for respondent refused to stipulate any grand jury material and refused to disclose any additional grand jury material on the ground that it was not disclosable without a rule 6(e) order. The list of materials reviewed by Agent DeShazo also identifies in box 6 of the documents a request for grand jury authorization. Respondent never advised this Court that there had been a prior request for the release of grand jury information. No order was ever entered *172 pursuant to rule 6(e), regarding either grand jury proceeding. On February 14, 1992, petitioner filed a motion for default judgment and for suppression of all evidence for abuse of grand jury process. This Court took petitioner's motion under advisement. OPINION Statute of Limitations
Section 6501(a), as a general rule, bars the assessment and collection of a deficiency in tax unless it is assessed within 3 years after the return was filed. Petitioner contends that he filed his tax return in February 1985, and that the 3-year statute of limitations therefore bars assessment in this case. Petitioner argues that the presentation of his tax return to an agent of the IRS in Jackson, Mississippi, on February 14, 1985, in the presence of his attorney, while he was in Federal custody, is sufficient to satisfy the filing requirements. Petitioner's contentions fail for two reasons: First, petitioner did not establish that he filed a 1983 Federal income tax return; and second, as discussed below, respondent carried her burden of proof with respect to the fraud penalty against petitioner, and therefore the 3-year statute of limitations is not applicable in this case. Pursuant *173 to section 6501(c)(3), when a taxpayer fails to file a tax return, the tax may be assessed at any time. See Rapp v. Commissioner, 774 F.2d 932 (9th Cir. 1985). Petitioner contends that he gave a copy of his 1983 return to an IRS employee when he was imprisoned in Mississippi. However, giving a delinquent return to an IRS agent does not constitute filing. W.H. Hill Co. v. Commissioner, 64 F.2d 506 (6th Cir. 1933), affg. 22 B.T.A. 1351 (1931); Espinoza v. Commissioner, 78 T.C. 412, 419-420 (1982); Metals Refining Ltd. v. Commissioner, T.C. Memo. 1993-115. Consequently, for purposes of section 6501(c)(3), petitioner did not file a tax return and respondent is, therefore, not barred from assessing a deficiency in this case. In addition, section 6501(c)(1) provides that in the case of a false or fraudulent return with the intent to evade the payment of tax, the tax may be assessed at any time. See Badaracco v. Commissioner, 464 U.S. 386 (1984); Patton v. Commissioner, 799 F.2d 166, 172 n.4 (5th Cir. 1986), *174 affg. T.C. Memo. 1985-148. In light of our holding below that petitioner acted fraudulently with respect to reporting his 1983 income, the statute of limitations does not bar the assessment of a deficiency in this case. Coleman v. Commissioner, 94 T.C. 82, 89 (1990); Blount v. Commissioner, 86 T.C. 383, 386 (1986). Therefore, regardless of whether petitioner filed a 1983 tax return, the statute of limitations does not bar the assessment of tax in this case. Exemption From Tax
Petitioner is a member of the Potawatomi Citizens Band Tribe of Oklahoma and contends that because of his Indian status he is not liable for Federal income taxes. Petitioner relies primarily on the Treaty with the Potawatimies, Sept. 8, 1815, art. 2, 7 Stat. 131, and Nash v. Wiseman, 227 F. Supp 552 (W.D. Okla. 1963), to support his contention. He further contends that the Federal Indian policy and acts of Congress enacted in pursuance thereof create an implied exemption from Federal taxation. Petitioner's contentions fail for three reasons. First, Indians, like other citizens, *175 are subject to Federal income taxation unless clearly exempted by statute or treaty. Squire v. Capoeman, 351 U.S. 1, 6 (1956); Poletti v. Commissioner, 99 T.C.     (1992); Estate of Shelton v. Commissioner, 68 T.C. 15, 21 (1977). Although statutes affecting Indians are liberally construed, tax exemptions must be clearly provided for and will not be created by implication. See Estate of Shelton v. Commissioner, supra.There is no general, implied exemption from Federal taxation as petitioner contends. Second, the U.S. treaty with the Potawatomi guaranteed to the Potawatomi "all the possessions, rights, and privileges, which they enjoyed, or were entitled to" in 1811. This treaty does not represent a recognition of immunity of tribal Potawatomi from Federal taxation. As explained in the Handbook of Indian Law: The Supreme Court has held that in their "ordinary affairs" Indians are subject to the federal income tax to the same extent as other persons. Congress has specified that certain Indian income arising out of the trust relationship with the United States is exempt *176 from the tax. The most important provisions relate to payments of judgments against the United States based on claims for land takings or other unfair dealings occurring many years before the payments. [Cohen, Handbook of Federal Indian Law 387, 391 (1982 ed.); fn. refs. omitted.]
Petitioner has failed to demonstrate any cognizable reason why the income he earned in his capacity as an attorney or the amounts which he embezzled from Mrs. Schaffer should be exempt from income tax. The funds were clearly unrelated to any Indian reservation or traditionally exempted items of income. See generally Indian General Allotment Act of 1887, ch. 119, 24 Stat. 388 (current version at 25 U.S.C. secs. 331-358 (1988)); Squire v. Capoeman, supra; Critzer v. United States, 220 Ct. Cl. 43, 597 F.2d 708 (1979). In Critzer, the taxpayer, a Cherokee Indian, failed to report the amounts which she earned from a motel/gift shop business which she ran on an Indian reservation. The Court of Claims held that the taxpayer was taxable on all of the shop's revenue. The court further *177 explained: There is no legal reason why this type of income should escape taxation while all other taxpayers, including Indians who work and operate businesses off the reservation, must pay their fair share of taxes. [Critzer v. United States, supra at 714.]
Similarly, we see no reason why the amounts which petitioner embezzled from Mrs. Schaffer or any of the other income which he earned during 1983 should be exempt from taxation. Finally, petitioner erroneously interprets Nash v. Wiseman, supra, as affording Potawatomi a complete exemption from Federal income tax. To the contrary, Nash stands for the proposition that lands held in trust by the United States under the Indian General Allotment Act of 1887, and income from such lands, are not taxable to noncompetent Indians. Id. at 554-555. The case does not support petitioner's contention that amounts which respondent asserts were underreported are likewise not taxable. Grand Jury
Petitioner contends that Agent DeShazo looked at grand jury material made available to him by Special Agent Kemp in violation of rule 6(e) and used it in *178 making the civil tax determination in this case. [3] Petitioner prays for a default judgment against respondent, the suppression of all grand jury evidence, and a shifting of the burden of proof to respondent because of the alleged violation of rule 6(e). Additionally, petitioner contends that the statutory notice of deficiency *179 should be invalidated due to the alleged violation of rule 6(e). In Graham v. Commissioner, 82 T.C. 299, 310-311 (1984), affd. 770 F.2d 381 (3d Cir. 1985), we addressed this question and explained: even assuming the illegality of respondent's use of the grand jury materials in this case, such use does not render the statutory notices null and void, requiring invalidation of the statutory notices. Since petitioners have conceded the deficiencies and fraud additions absent invalidation of the statutory notices, we leave to another day the determination of the appropriate remedy in this Court where respondent has improperly used grand jury materials in preparing a statutory notice of deficiency. We simply hold that invalidation of the statutory notice is not that remedy. [Fn. refs. omitted.]
Consequently, petitioner's contention is without merit. Rule 6(e) provides generally that grand jury proceedings are secret. Bell v. Commissioner, 90 T.C. 878, 902 (1988); Graham v. Commissioner, supra at 306. The purpose of rule 6(e) is to protect from disclosure *180 the "essence of what takes place in the grand jury room, in order to preserve the freedom and integrity of the deliberative process." [4] *181 In re Grand Jury Investigation, 630 F.2d 996, 1000 (3d Cir. 1980). To this end, rule 6(e)(2)[5] prohibits certain persons from disclosing "matters occurring before the grand jury" (grand jury matter) and provides that a knowing violation of the rule may be punished as a contempt of court. [6]
*182 It is well established that grand jury matter should not be ordered disclosed to the IRS for use preliminarily to or in connection with a judicial proceeding without a showing of a particularized need. United States v. Baggot, 463 U.S. 476 (1983); United States v. Sells Engineering, Inc., 463 U.S. 418 (1983); Hajecate v. Commissioner, 90 T.C. 280, 284 (1988). To find a violation of rule 6(e), we must find not only that the information constitutes grand jury matter, but also that it was received and used by respondent for civil audit purposes including the preparation of the notice of deficiency herein. See Berkery v. Commissioner, 91 T.C. 179, 188 (1988), affd. without published opinion 872 F.2d 411 (3d Cir. 1989). Petitioner seeks suppression of specific items of evidence allegedly used in violation of rule 6(e). These items fall into three categories. The first category consists of evidence which was introduced at petitioner's criminal trial. The second category consists of the evidence which Agent DeShazo acquired from the *183 FBI which was acquired through a valid search warrant of petitioner's residence in Texas. The third category consists of evidence introduced before the grand jury via a grand jury subpoena. First we address the evidence which was introduced at petitioner's criminal trial. Evidence which is presented at a criminal trial is not protected by the guarantees of secrecy surrounding grand jury investigations, but rather is a matter of public record. E.g., Sisk v. Commissioner, 791 F.2d 58 (6th Cir. 1986), affg. an unpublished order of this Court; In re Special February 1975 Grand Jury (Baggot), 662 F.2d 1232, 1236-1237 n.10 (7th Cir. 1981), affd. sub nom. United States v. Baggot, 463 U.S. 476 (1983); Bell v. Commissioner, supra at 903-904; see also Callahan v. Commissioner, T.C. Memo. 1992-132. Consequently, respondent is not prohibited from using evidence brought before a grand jury which was subsequently used at petitioner's criminal trial to determine petitioner's 1983 civil tax liability. Petitioner also seeks suppression *184 of the boxes of evidence seized at his Texas residence pursuant to a valid search warrant. Respondent contends that the boxes of material seized by the FBI from petitioner's residence do not constitute grand jury matter. Respondent relies on In re Grand Jury Subpoena, 920 F.2d 235 (4th Cir. 1990), and In re Grand Jury Matter (Catania), 682 F.2d 61 (3d Cir. 1982). These two cases are not dispositive of the issue. In In re Grand Jury Subpoena, supra, the Court of Appeals for the Fourth Circuit held that information produced by criminal investigations paralleling grand jury investigations does not constitute grand jury matter if the parallel investigation is truly independent of the grand jury proceeding. Id. at 242; see In re Grand Jury Investigation, 610 F.2d 202, 217 (5th Cir. 1980). Similarly, in In re Grand Jury Matter (Catania), supra at 64, the Court of Appeals for the Third Circuit held that information developed by the Government investigatory agency, which was developed with an *185 eye toward ultimate use in a grand jury proceeding, does not become protected by rule 6(e) if it exists separately and independently of the grand jury process. Respondent did not establish that the FBI search was in any way separate or independent of the Oklahoma grand jury. To the contrary, the search warrant indicates that petitioner's residence was searched to locate evidence of controlled substance distribution in connection with the Schaffers. The Schaffers' drug trafficking activity apparently was the focus of the grand jury. Consequently, we cannot hold as a matter of law that the evidence seized from petitioner's residence does not constitute grand jury matter solely because it was obtained through a valid search warrant. The critical factor in both of the cases on which respondent relies was not the fact that the information was obtained by a search warrant, but rather that disclosure of the documents would not reveal what occurred before the grand jury. In other words, the information did not constitute grand jury matter. See Lombardo v. Commissioner, 99 T.C.    ,     (1992) (slip op. at 36). Therefore, we must determine whether information seized by *186 the FBI constitutes grand jury matter. The Supreme Court has not addressed the issue of what constitutes grand jury matter for purposes of rule 6(e). This Court recently addressed this issue in Lombardo v. Commissioner, supra. The question presented in Lombardo was whether pre-grand-jury investigative materials constituted grand jury matters. In determining that the information gathered by the U.S. attorney was not grand jury matter, we defined grand jury matter as those documents which would disclose the content of the grand jury proceeding. Id. Disclosure may be direct or indirect. Hajecate v. Commissioner, supra at 284. Numerous other courts have also interpreted the phrase to include anything that may reveal what transpired during the grand jury proceeding. In re Grand Jury Subpoena, supra; Standley v. Department of Justice, 835 F.2d 216, 218 (9th Cir. 1987); In re Grand Jury Matter (Catania), supra; In re Grand Jury Investigation, supra at 216-217; United States v. Interstate Dress Carriers, Inc., 280 F.2d 52, 54 (2d Cir. 1960). In answering *187 the question of whether the documents constitute grand jury matter, we are guided by the fact that the policy of grand jury secrecy is not absolute and that rule 6(e) was designed to protect from disclosure only the essence of what takes place in the grand jury room. United States v. Interstate Dress Carriers, Inc., supra at 54. Finally, in order to uphold the policy concerns regarding the need for grand jury secrecy, "Absent a clear indication that documents submitted to a grand jury are not entitled to protection, we will not approve a breach of this secrecy" of the grand jury proceedings. Hajecate v. Commissioner, 90 T.C. at 286. We now address whether the documents obtained through the search warrant and the grand jury subpoena are grand jury matters such that respondent's alleged use of the information violated rule 6(e). Generally, grand jury transcripts, exhibits, notes, and memoranda of interviews prepared by agents of the grand jury are considered grand jury matter because they disclose the nature and scope of the grand jury proceedings. In re Grand Jury Proceedings, 851 F.2d 860 (6th Cir. 1988). *188 However, not all documents which are presented to a grand jury are presumed to constitute grand jury matter. The mere fact that a particular document is reviewed by the grand jury does not covert it into grand jury matter. Lombardo v. Commissioner, supra at     (slip op. at 33). Documents such as business records, which are created for purposes independent of grand jury investigation, may have legitimate uses unrelated to the substance of the grand jury proceeding. In re Grand Jury Investigation, 630 F.2d 996, 1000 (3d Cir. 1980). When such documents are later used for the information contained in the record, rather than to learn about the deliberation of the grand jury, it is not a valid defense to disclosure that the same information previously had been revealed to a grand jury. Id.; United States v. Interstate Dress Carriers, Inc., supra; Bell v. Commissioner, 90 T.C. 878, 902-903 (1988); Hajecate v. Commissioner, supra at 285. However, even documents sought for their own sake may, when considered in the aggregate and in their *189 relationship to one another, make possible inferences about the nature and direction of the grand jury inquiry. In re Grand Jury Proceedings, supra at 865. In this case, we are not dealing with traditional business documents, but rather the documents are petitioner's personal notes. These documents were prepared independently of the grand jury's investigation. Petitioner has offered no reason for us to believe that respondent's alleged use of the documents revealed any aspects of the deliberations of the grand jury. The grand jury focus was on the Schaffers' drug trafficking activities. Petitioner was indicted due to his involvement in preparing the Schaffers' income tax return. No indictments were made regarding petitioner's own underreporting of income. Looking at the record as a whole we are convinced that respondent did not use the evidence to learn about the deliberations of the grand jury. Petitioner relies on In re Grand Jury Matter, 697 F.2d 511 (3d Cir. 1982), in support of his contention that the documents at issue constitute grand jury matter. The documents in this case are clearly distinguishable from those in In re Grand *190 Jury Matter, supra.In that case, documents were considered grand jury matter because they revealed the contents of the grand jury proceeding no less than the transcripts of the witnesses' testimony revealed such contents. In reversing the trial court, the Court of Appeals for the Third Circuit held that the auditor's analysis and certain invoices which the trial court ordered disclosed contained the auditor's conclusions about the legitimacy of certain expenses and revealed the contents of the grand jury proceeding. Most importantly, the court noted that the analysis did not exist independently of the grand jury proceeding and had been prepared for, and presented to, the grand jury. Id. at 512-513. We conclude that the documents at issue do not constitute grand jury matter under rule 6(e). The documents were created independently of, and had a use unrelated to, the grand jury proceedings. As such, the documents, standing alone or in the aggregate, do not reveal the essence of the grand jury proceedings. See DiLeo v. Commissioner, 959 F.2d 16 (2d Cir. 1992); United States ex rel. Woodard v. Tynan, 757 F.2d 1085 (10th Cir. 1985). *191 To the contrary, the documents merely reveal petitioner's plans as to the use of the money which he embezzled from Mrs. Schaffer and his plans for the future. Since we have concluded that there was no violation of rule 6(e), petitioner's motion for suppression is denied. We have considered petitioner's remaining contentions with regard to rule 6(e) and find them to be without merit. See In re Special February 1975 Grand Jury (Baggot), 662 F.2d 1232 (7th Cir. 1981); Jones v. Commissioner, 97 T.C. 7 (1991). Embezzled Funds
A. Taxable Year of Conversion
Section 61 provides that except as otherwise provided in the Internal Revenue Code, gross income includes income from whatever source derived. It is well settled that income from embezzlement is includable in gross income in the year of embezzlement. [7]James v. United States, 366 U.S. 213, 218-219 (1961); sec. 1.61-14(a), Income Tax Regs. Petitioner contends that under the claim of right doctrine the amounts which he converted from the Southwestern Bank safe-deposit box on January 11, 1983, constitute income in the taxable *192 year 1982 if the amounts constitute income at all. He contends that his unrestricted access to the funds in the safe-deposit box compounded with the performance of legal services for the Schaffers during 1982 qualifies the funds as taxable income in 1982.
*193 Under the claim of right doctrine, a taxpayer who receives income under a claim of right that is free of restrictions must include that amount in income for the year of receipt. North American Oil Consol. v. Burnet, 286 U.S. 417 (1932). Even assuming that the claim of right doctrine is relevant to our analysis, petitioner has failed to prove that two of the essential elements were present during 1982: First, petitioner did not establish that he received any of the money during 1982; and second, petitioner did not establish that he received the income under a claim of right during 1982. See Wootton, "The Claim of Right Doctrine and Section 1341", 34 Tax Law. 297, 308 (1980-81). In applying the claim of right doctrine to illegally obtained income, the Supreme Court, in James v. United States, supra at 219, restated the claim of right doctrine as follows: When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he is required to return, even though *194 it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." * * * [Emphasis added; citations omitted.]
Here, petitioner did not acquire any funds until 1983. Moreover, in order for the claim of right doctrine to apply, the taxpayer must treat the income as belonging to the taxpayer, i.e., under a claim of right. Healy v. Commissioner, 345 U.S. 278 (1953). In this case, petitioner did not treat the money in the Southwestern Bank safe-deposit box as his own during 1982. To the contrary, petitioner was acting as Mrs. Schaffer's fiduciary until he breached his fiduciary relationship and embezzled the funds from Mrs. Schaffer during January 1983. The claim of right doctrine provides no solace to petitioner in this case. Rather than relying on the claim of right doctrine, we look to the indisputable facts of this case. The facts demonstrate that petitioner held Mrs. Schaffer's money for her in 1982, keeping it in two separate bank safe-deposit boxes in Oklahoma with her knowledge and consent. In January 1983, petitioner embezzled the funds from Mrs. Schaffer, removed *195 them from the Oklahoma bank, and transferred them to Texas, where he deposited them to his own account. Mrs. Schaffer's testimony was clear that petitioner was acting as her attorney at the time the money was removed from the safe-deposit box, and that she did not loan the money to him or give him the money as a gift. The embezzlement or conversion in this case occurred in January 1983 when petitioner first exerted control over the money inconsistent with his fiduciary capacity. B. Amount of Funds Converted
Having concluded that the money which petitioner embezzled from Mrs. Schaffer constitutes 1983 taxable income, we now turn to the question of the amount of money which was embezzled. After a careful review of the entire record, we are convinced that petitioner embezzled at least $ 494,000 from Mrs. Schaffer. In reaching this result, we rely primarily on Mrs. Schaffer's testimony which establishes that $ 540,000 was placed into the Southwestern Bank safe-deposit box in December 1982. The money had been stored in a safe in the floor of her house and represented $ 380,000 which she and Ms. Strange received for the drugs which were dropped during the final airplane flight *196 of their husbands and $ 200,000 which had accumulated from prior flights. Mrs. Schaffer testified that she knew how much money was placed in the safe-deposit box because she counted the money prior to depositing it. We observed her demeanor, and we found her to be a credible and forthright witness who was doing her best to remember specific information. The record is clear that petitioner removed the entire contents of the Southwestern Bank safe-deposit box on January 11, 1983. He immediately gave Mrs. Schaffer $ 40,000 for living expenses, and after leaving Oklahoma City sent approximately $ 6,000 of the remaining $ 500,000 to Mrs. Schaffer for her to make a payment on a helicopter. The $ 494,000 that was remaining was converted by petitioner and used by petitioner to purchase numerous assets and pay for his support. In addition, the fact that at least $ 500,000 was placed in the safe-deposit box on December 3, 1982, is further corroborated by petitioner's own pocket calendar which contains an entry on December 3, 1982: "Meet Linda Schaffer & moved money $ 500,000 to SW Bk." Petitioner did not work and had no sources of income from January 27, 1983, until he was arrested in *197 1985. During such time, however, petitioner invested $ 141,793.46 in cash in a house, and made numerous cash expenditures on cars, a motorcycle, gold, and silver. Petitioner's own list stated that the value of these assets was approximately $ 323,693. In addition to the above expenditures, petitioner had at least $ 122,000 in cash after making the above expenditures. Even allowing for the cash which petitioner took to Texas which was unrelated to the embezzlement, respondent has substantiated a substantial portion of the amount determined in the notice of deficiency. This further corroborates Mrs. Schaffer's testimony and supports our conclusion that petitioner embezzled $ 494,000 from Mrs. Schaffer in 1983. Torque Master, Inc.
In the notice of deficiency, respondent determined that petitioner received unreported income from Torque Master, Inc., during 1983 in the amount of $ 64,607. Respondent conceded this adjustment except to the extent of $ 16,495.95, which represents three checks from Torque Master, Inc., to petitioner made payable during 1983. The three checks were in the amounts of $ 942.63, $ 3,664.07, and $ 11,889.25. The check in the amount of $ 11,889.25 *198 was written on a Kemper Money Market Account. In his petition, petitioner denies that he received any of these checks and the funds derived therefrom. Petitioner has failed to meet his burden of proof with respect to this issue. Rule 142(a). The exhibits which petitioner introduced as support for his contention are not legible. Moreover, during the trial of this case, petitioner abandoned his contention that he did not receive the checks. Therefore, we have no basis to conclude that petitioner did not receive the checks at issue. At trial, petitioner argued the majority of Torque Master, Inc. income was constructively received in 1982. He contends that Torque Master, Inc., gave him a salary of $ 2,000 per month, plus $ 5,000 per month as discretionary funds to do with as he pleased. Petitioner testified that he used the $ 5,000 per month to establish a Kemper Money Market Account in the name of Torque Master, Inc., with petitioner as the only signatory on the account. Petitioner thus argues that he should have reported the $ 5,000 per month as his income at that point, and the distributions from the Kemper Money Market Account to him in 1983 should be nontaxable. Petitioner *199 did not pursue this matter in his brief. Petitioner has failed to meet his burden of demonstrating that any of the $ 16,495.95 constituted income during 1982. With respect to the Kemper Money Market account check, the evidence in the record is insufficient to support petitioner's contentions. All that petitioner has established is that the Kemper Money Market Account was opened by Torque Master, Inc., during 1982, that Torque Master, Inc., accumulated money in that account during 1982, and that money from that account was paid to petitioner during 1983. However, there is nothing in the record, other than petitioner's self-serving testimony, to establish that petitioner had the discretion to withdraw the $ 5,000 per month during 1982. See Geiger v. Commissioner, 440 F.2d 688, 689-690 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159. Consequently, the adjustment, as partially conceded by respondent, is sustained. John O. Hornung, P.C.
In the notice of deficiency, respondent determined that petitioner received unreported income from John O. Hornung, P.C., during 1983 in the amount of $ 2,409. This adjustment *200 was derived from three checks, each in the amount of $ 803, from John O. Hornung, P.C., to petitioner during 1983. The checks were drafted in February and March of 1983. At trial, petitioner testified that after he fled to Texas, his wife drafted these checks payable to petitioner, signed the checks in her name, and then deposited the amounts in an Oklahoma account. Copies of these checks were introduced into evidence which clearly indicate that Ms. Parker signed the checks and deposited them in an account which petitioner did not have access to since he was no longer living in Oklahoma. We are convinced that petitioner never received any benefit from the said funds and had no knowledge that his wife has forged the checks. Consequently the funds derived from the checks did not constitute taxable income to petitioner in 1983. Fraud Under Section 6653(b)
Respondent determined that petitioner was liable for additions to tax under section 6653(b)(1) and (2) for fraudulently understating his income in 1983. Section 6653(b)(1), in effect for 1983, provides for an addition to tax of 50 percent of the underpayment if any part of any underpayment of tax required to be shown on *201 a return is due to fraud. Section 6653(b)(2) provides an addition to tax equal to 50 percent of the interest payable on the portion of the understatement attributable to fraud. For purposes of section 6653(b)(1), respondent has the burden of proving two elements by clear and convincing evidence: First, that an underpayment exists, and second, that some part of the underpayment is due to fraud. Sec. 7454(a); Rule 142(b); Patton v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986), affg. T.C. Memo. 1985-148; Parks v. Commissioner, 94 T.C. 654, 660-661 (1990); Miller v. Commissioner, 51 T.C. 915 (1969). In establishing that an underpayment exists, respondent may not rely merely upon the taxpayer's failure to carry the burden of proof as to the underlying deficiency. Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989); Estate of Beck v. Commissioner, 56 T.C. 297, 363 (1971). When the allegations of fraud are intertwined with unreported income, respondent can satisfy her burden by proving a likely source *202 of income. Holland v. United States, 348 U.S. 121 (1954); Nicholas v. Commissioner, 70 T.C. 1057 (1978). Respondent established numerous sources of petitioner's unreported income, notably the money embezzled from Mrs. Schaffer. Based on the findings we made above, respondent has met her burden of demonstrating by clear and convincing evidence that there was an underpayment of tax. To establish that the taxpayer had the requisite fraudulent intent necessary to impose additions for fraud, respondent must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Patton v. Commissioner, supra; Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968); Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939); Parks v. Commissioner, 94 T.C. 654 (1990); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). In establishing *203 a fraudulent intent, respondent need not establish that tax evasion was a primary motive of the taxpayer, but may satisfy her burden by showing that a "tax-evasion motive [played] any part" in the taxpayer's conduct, including conduct designed to conceal another crime. Worcester v. Commissioner, 370 F.2d 713, 717 (1st Cir. 1966) (citing Spies v. United States, 317 U.S. 492, 499 (1943)), affg. in part and vacating in part on another issue T.C. Memo. 1965-199. Moreover, for purposes of section 6653(b)(1), respondent need not prove the precise amount of the underpayment resulting from fraud; so long as she shows that "any part of any underpayment * * * is due to fraud," the addition to tax will be upheld. Conforte v. Commissioner, 692 F.2d 587, 590 (9th Cir. 1982), affg. in part and revg. in part 74 T.C. 1160 (1980). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Parks v. Commissioner, supra at 660; Recklitis v. Commissioner, 91 T.C. 874, 909 (1988). *204 Because it is seldom possible to prove fraud by direct proof of intention, the required intent may be shown by circumstantial evidence. Spies v. United States, supra; Rowlee v. Commissioner, supra at 1123. The taxpayer's entire course of conduct may be examined to establish the requisite fraudulent intent. Recklitis v. Commissioner, supra at 910; Meier v. Commissioner, 91 T.C. 273, 297 (1988); Stone v. Commissioner, 56 T.C. 213, 223-224 (1971). Courts have relied on a number of indicia of fraud in deciding section 6653(b)(1) cases. Such "badges of fraud" include: Failing to report substantial portions of income which the taxpayer knew to be taxable, inadequate records, failure to file tax returns, implausible or inconsistent explanations of behavior, concealment of assets, failure to cooperate with tax authorities, engaging in illegal activities, attempting to conceal illegal activities, dealing in cash, and failing to make estimated payments. See Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), *205 affg. T.C. Memo. 1984-601; Meier v. Commissioner, supra.
Respondent contends that the combination of the following acts demonstrates petitioner's intent to evade paying Federal income tax: There was an understatement of income; petitioner failed to file a return for 1983; petitioner's entire course of conduct was designed to conceal his assets and activities -- he fled from Oklahoma to Texas and changed his name in an effort to conceal his activities and identity; before changing his name, petitioner purchased a car in the name of a nominee (Ken Copeland) to conceal the ownership; and finally, petitioner engaged in illegal activities, namely the conversion of funds from his client, Mrs. Schaffer. It is well established that while a taxpayer's failure to file a tax return is an indication of fraud, it does not, standing alone, establish fraud. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962). However, when "the failure to file is coupled with other badges or circumstances that establish an intent to conceal or mislead, an inference of fraud is justified." Recklitis v. Commissioner, supra at 911. *206 Such additional circumstances or badges are present in this case. In this case, there is also evidence in the record to reflect petitioner's state of mind during 1983. Included in petitioner's personal belongings seized during the execution of a search warrant was a personal notebook that included various handwritten notes concerning petitioner's change of identity and his overall plan to continue his life after embezzling nearly $ 500,000 and relocating to Texas. Petitioner's notes also included a statement which sheds light on petitioner's state of mind during the year at issue. The note read: "There's so much right, You wonder why its wrong." The evidence shows that petitioner substantially understated his income in 1983. Petitioner embezzled almost $ 500,000 from Mrs. Schaffer during 1983. Petitioner testified that he knew embezzled funds constituted taxable income. There is no evidence in the record that suggests that petitioner believed that he was exempt from taxation at the time he failed to file his 1983 return. To the contrary, petitioner asked this Court to find as a matter of fact that he gave his wife a power of attorney so that she could file returns on his *207 behalf, and that she filed a 1984 return and other returns on his behalf. These actions are inconsistent with petitioner's current contention that he did not have the requisite fraudulent intent because he believed himself exempt from taxation based on his Indian status. The fact that the unreported income was derived from an illegal activity, which petitioner attempted to conceal by fleeing from Oklahoma and changing his name, is a circumstance which may be considered in the overall evaluation of petitioner's fraudulent intent. Patton v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986), affg. T.C. Memo. 1985-148; Bradford v. Commissioner, supra at 307-308. As we noted in McGee v. Commissioner, 61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975): "it is a fair inference that a man who will misappropriate another's funds to his own use through misrepresentation and concealment will not hesitate to misrepresent and conceal his receipt of those same funds from the Government with the intent to evade tax." Petitioner's willingness *208 to defraud Mrs. Schaffer points to a willingness to defraud the Government. Solomon v. Commissioner, 732 F.2d 1459, 1462 (6th Cir. 1984), affg. T.C. Memo. 1982-603. In determining the presence of fraud, we must also consider the training, experience, and education of petitioner. Simms v. Commissioner, 422 F.2d 340 (4th Cir. 1970), affg. T.C. Memo. 1968-298; Drobny v. Commissioner, 86 T.C. 1326, 1349 (1986); Iley v. Commissioner, 19 T.C. 631, 635 (1952). Here, petitioner is an intelligent and educated man who graduated from college and law school. Having worked as a special agent for the IRS for a number of years, he undoubtedly was aware of the necessity of including all income on his tax return. From this experience, it is implausible to conclude that he did not know that stolen money was taxable to him and that he was obligated to file a Federal income tax return reporting such income. See Bradford v. Commissioner, supra at 307-308; Solomon v. Commissioner, supra at 1461-1462. *209 Petitioner, in his defense, contends that he made provisions for timely filing his 1983 tax return, that he made substantial payments of tax in 1983, that he maintained adequate records which he offered to respondent during the audit in this case, and that his reliance on Nash v. Wiseman, 227 F.Supp. 552 (W.D. Okla. 1963), negates a finding of fraud as a matter of law. Petitioner cites no case law in support of his proposition, and we are not persuaded that the above factors negate a finding of fraud. Petitioner also relies on United States v. Critzer, 498 F.2d 1160 (4th Cir. 1974). However, in relying on Critzer, petitioner has confused criminal with civil fraud. See Helvering v. Mitchell, 303 U.S. 391 (1938). In Critzer, the criminal defendant, a Cherokee Indian, was indicted for violations of the revenue laws with respect to moneys she earned from a motel/gift shop business which she ran on a reservation in North Carolina. The defendant did not report any of the shop's revenues as income, claiming exemption as an Indian for moneys derived from the land. The defendant was *210 able to establish a lack of willfulness for criminal purposes by showing inconsistent treatment of the income items by two Government agencies. The standard for determining whether a taxpayer is criminally fraudulent is more onerous than the standard for determining whether a taxpayer is civilly fraudulent. Consequently, Critzer offers no solace to petitioner. Moreover, notwithstanding her acquittal in the criminal proceeding, subsequently, the Court of Claims determined that the defendant was taxable on all of the shop's revenues. Critzer v. United States, 220 Ct. Cl. 43, 597 F.2d 708 (1979). Based on the fact that petitioner failed to report substantial portions of his income in 1983 which he knew to be taxable, that there was a large understatement of income, that petitioner failed to file a return, and that petitioner engaged in illegal activities, we conclude that petitioner acted fraudulently in underreporting his taxable income for 1983. Consequently, the addition to tax under 6653(b)(1) is sustained. Section 6653(b)(2) provides an addition to tax equal to 50 percent of the interest payable on the understatement attributable *211 to fraud. Respondent must establish the specific portion of the underpayment of tax which is attributable to fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); see DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992). Respondent contends that with respect to section 6653(b)(2), all of the underpayment is due to fraud. Examining the record as a whole, we conclude that only the portion of the understatement found herein which is attributable to the adjustment for the funds which petitioner embezzled from Mrs. Schaffer is attributable to fraud. See Estate of Stimson v. Commissioner, T.C. Memo. 1992-242; Bingo v. Commissioner, T.C. Memo. 1991-248, affd.    F.2d     (11th Cir., Feb. 25, 1993). As to the remaining amounts, respondent has failed to prove the requisite fraudulent intent. Consequently, the section 6653(b)(2) addition is sustained only with respect to the embezzled amounts. Failure To Pay Estimated Income Tax Under Section 6654
Respondent also determined that petitioner is liable for an addition *212 to tax for failure to pay estimated income tax under section 6654. Petitioner contends that he is not liable for the addition to tax under section 6654 due to his tax-exempt status as a Potawatomi Indian and because there is no evidence of an underpayment of tax. Initially we note that additions to tax under section 6654 are mandatory absent a showing by petitioner that one of the exceptions provided in section 6654(d) is applicable. Recklitis v. Commissioner, 91 T.C. 874, 913 (1988); Grosshandler v. Commissioner, 75 T.C. 1, 21 (1980). There is nothing in the record to indicate that petitioner made estimated income tax payments toward his tax liabilities or that he filed any estimated income tax returns. Petitioner's contentions relating to the section 6654 addition to tax are without merit. Accordingly, respondent's determination is sustained. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. 50 percent of interest due on the portion of the underpayment due to fraud.↩
1. Respondent conceded on answer a $ 24,447 adjustment identified in the notice of deficiency as capital gains and losses. Respondent also conceded in her opening brief the $ 12,441 Government disability annuity adjustment and $ 48,111.05 of the $ 64,607 adjustment in the notice of deficiency relating to unreported income from Torque Master, Inc.↩
2. Petitioner presented this document to respondent and requested that it be included in the stipulation of facts. Respondent did not utilize this exhibit in any way and does not object to deleting it from the stipulation of facts.↩
3. Three of the Exhibits which petitioner contends are grand jury matters he relied upon in presenting his case: Joint Exhibit 35-AI; Joint Exhibit 34-AX; and Joint Exhibit 50-AX. The documents were stipulated and admitted into evidence. Moreover, petitioner attempted to impeach Mrs. Schaffer at the trial of this case by using her grand jury testimony. We conclude that since petitioner has introduced these exhibits into the public record, he waives his rule 6(e) claims as to these matters. Cf. Sisk v. Commissioner, 791 F.2d 58 (6th Cir. 1986), affg. an unpublished opinion of this Court; Bell v. Commissioner, 90 T.C. 878↩ (1988).
4. There are three types of dangers involved in disclosure of grand jury matter to Government attorneys for use related to civil proceedings: 1. Disclosure increases the risk of inadvertent or illegal further release of information to unauthorized persons and thus may threaten the willingness of witnesses to testify fully and candidly; 2. A threat to the integrity of the grand jury process itself if there is a tendency for the government to abuse the grand jury process; and 3. Possible subversion of the limits otherwise placed on the Government's investigative and discovery powers in the civil context. [In re Grand Jury Proceedings, 851 F.2d 860, 864↩ (6th Cir. 1988).]
5. Rule 6(e)(2) provides as follows: (2) General Rule of Secrecy. A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, an attorney for the government, or any other person to whom disclosure is made under paragraph (3)(A)(ii) of this subsection shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules. No obligation of secrecy may be imposed on any person except in accordance with this rule. A knowing violation of rule 6 may be punished as a contempt of court.
Rule 6(e)(3) provides as follows: (3) Exceptions. * * * (C) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made -- (i) when so directed by a court preliminarily to or in connection with a judicial proceeding;↩
6. The Supreme Court in United States v. Sells Engineering, Inc., 463 U.S. 418, 441-442 (1983), held that Government attorneys, other than those working on the criminal matters to which the grand jury investigation pertains, must obtain a court order under rule 6(3)(C)(i) to obtain grand jury material. In United States v. Baggot, 463 U.S. 476 (1983), the Supreme Court held than an IRS audit of civil tax liability was not "preliminary to or in connection with the judicial proceeding" and, therefore, that disclosure of grand jury material could not be made under the exception in rule 6(3)(C)(i)↩ for such purposes.
7. In general, the burden is on the taxpayer to prove that respondent's notice of deficiency is incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). However, courts have recognized an exception to the general rule when respondent alleges that the taxpayer has unreported illegal income. Petzoldt v. Commissioner, 92 T.C. 661, 688 (1989). In such a case, several courts have noted "that a court need not give effect to the presumption of correctness in a case involving unreported income if the Commissioner cannot present some predicate evidence supporting its determination." Portillo v. Commissioner, 932 F.2d 1128, 1133 (5th Cir. 1991), affg. T.C. Memo. 1990-68. Moreover, the Court of Appeals for the Fifth Circuit, to which appeal of this case would lie, applies this principle whether the unreported income was allegedly obtained legally or illegally. Id.
Arguably, this exception is applicable to this case as respondent contends that petitioner failed to report income which he embezzled from Mrs. Schaffer. Here, however, respondent presented evidence, through the testimony of Mrs. Schaffer and joint exhibits, demonstrating the manner in which petitioner embezzled the funds, the amount of embezzled funds, the use of the embezzled funds, and the fact that the funds were not reported as income for 1983. Consequently, respondent has made a sufficient threshold showing to support her determination, and petitioner bears the burden of demonstrating the notice of deficiency is incorrect.↩